IN RE WELSH.

NEW YORK COUNTY—HON. ANTHONY L. ROBERTSON, SURROGATE—
December, 1849.

## *In re* WELSH.*

### *In the Matter of proving the Last Will and Testament of*
### MARY WELSH, *deceased.*

Undue influence in procuring a will may not only be proved by direct evi-
dence of importunity, or the practice of arts upon the decedent, but
may be presumed from facts ;—which throws upon the party propound-
ing it for probate, the burden of establishing free agency and under-
standing of the contents of the instrument.

Proof of prior instructions corresponding with the contents of a will, or com-
plete recognition of every part of it as the free act of the decedent, is in-
dispensable in every case of diminished mental power, accompanied by
suspicious circumstances as to the origination and execution of the instru-
ment. Mere acknowledgment of the will is not sufficient; it must ap-
pear to be the result of the decedent's own suggestions, freed from any
influence.

The rector of a church which is residuary legatee in a will, who has the nom-
ination to two scholarships created by it in a theological seminary, who
procured the will to be drawn, was named therein as sole executor
thereof, and superintended its execution, is a person so benefited by it as
to require an investigation as to its *spontaneous* character.

Such an interest, under the common law, only makes a legacy presumptively
void, although under the civil law it was absolutely void.

The relation of spiritual adviser, where the person holding it procures a will
to be drawn, and superintends its execution, by which a church in which
he is interested is benefited, raises enough of a presumption of undue
influence to require proof of spontaneity or volition to repel it.

Part of a will may be refused probate in consequence of undue influence in
regard to it, and the residue admitted. The same rule prevails as in case
of incompetency or fraud as to such part.

This was an application on the part of Richard Cox, sole
executor of the last will and testament of Mrs. Mary Welsh,
that the will be admitted to probate. The will was con-

* This case is also reported in 7 *N. Y. Leg. Obs.*, 153. The case is here
reported with the numerous typographical errors of that report kindly cor-
rected by Chief-justice Robertson, now of the N. Y. Superior Court Bench.

tested by several of the next of kin, as being the result of undue influence exercised by parties benefited, and they claimed that the probate should be refused.

The will bequeathed various legacies, in sums from three hundred to one thousand dollars, to different claimants on the bounty of the testatrix, to the extent of upwards of one-fourth of her estate; it then gave to the Episcopal Theological Seminary five thousand dollars to educate two indigent persons for ministers in that church, called founding two scholarships, one to be called the "Mary Welsh," the other "The Zion Church" scholarship; the nomination to them to be vested in the rector for the time being of "Zion Church," in the city of New York. It then bequeathed one thousand dollars to missionary purposes, and finally constituted said Zion Church residuary legatee with remainder over, in case of dissolution, to the same theological seminary; it also constituted Mr. Cox, the rector of that church, sole executor, with power of sale of the real estate. The will was drawn by Mr. Barker, a vestryman of Zion Church, who before had not known Mrs. Welsh, at the request of Mr. Cox, who went with him, and was present at the execution.

W. SILLIMAN, *for proponent.*

A. BLANCHARD, *for next of kin, contestants.*

THE SURROGATE.—Undue influence may be proved by direct evidence of importunity, or the practice of arts upon the decedent by the supposed agent; or may be presumed from the proof of facts which throws upon the party seeking to establish the will in question, the burden of proving it to have been the result of free agency and complete understanding of the contents; and this case is put by the contestants on both grounds. But of the former species of evidence, there is little trace in this case, except mere conjecture as to the objects of visits by the party implicated, to the decedent, not sufficient to merit much consideration; and I shall, therefore, proceed immediately to consider the presumptive evidence which requires countervailing proof to overthrow it.

The first point to be looked at in this connection is, the position and character of the decedent. She was a widow upwards of eighty-five years of age, possessed of an estate of upwards of twenty thousand dollars, consisting of about twelve thousand dollars of real estate, and the residue of personal, which seems to have been derived from her deceased husband. She had no descendants, nor was there any one who seems particularly to have been intended or selected by her as the object of her posthumous bounty; she lived alone with a very aged companion, and was dependent upon several persons, strangers to her blood, for occasional services in her household, and small matters of business; her own relations, with two exceptions, resided at some distance from her, and visited her occasionally. Some of her husband's relatives resided more near her and visited her more frequently. The decedent died of a pulmonary disease about eleven o'clock of the evening of the day the will was executed, which took place about two o'clock in the afternoon. The natural character of the decedent, or as it developed itself towards the end of her life, is to be gathered from the testimony of all the witnesses.

The testimony of Mrs. Sawyer, Mrs. Knapp, and Dr. Underhill, shows her to have been set in her ways, not easily persuaded, opposed to making a will, and resisting medical directions. The admissions of Mr. Cox show her to have been a woman of considerable mind and a good deal of independence, impatient of advice, leading to mismanagement of her affairs by accumulating idle hoards in banks, amounting at her death to $2700, while she had $1600 loose cash in her house.

This kind of self-reliance is rather opinionativeness than independence, and is not inconsistent with a liability to be governed, if properly approached. Still, it requires some evidence to show that the energy which gave character to this obstinacy had failed, and that nothing remained but the unreasoning caprice; or, that arts had been practised which turned her strength to her destruction. For this purpose, the

condition of the party must be examined, at the time of the *factum*.

The disease affecting the decedent at the time of her death was lingering and exhausting, so much so as to prevent rest, except in a sitting posture in a chair. Though not likely directly to affect the mind, it still must have greatly impaired its energies at so advanced an age, so shortly before her decease.

This effect was visibly and rapidly approaching towards the close of her life, according to the testimony of Mrs. Sawyer, young Mr. Shepherd, and Drs. Underhill and Hyslop, particularly as regarded her physical strength; her faculty of memory was evidently much damaged, particularly as regarded claims on her bounty and affection; her forgetfulness of Miss Shepherd, Miss Test, and Mr. Heins, shows this.

At the very time of executing the will, her infirmity and failing strength must have been apparent, for though she expressed no inability, and was not asked if she could write, Mr. Barker, the draughtsman and subscribing witness to the will, suggested that she should make her mark instead of writing her name, which could only have originated from some appearance of great weakness.

The character of her signature confirms this; and the only circumstance relied on by Mrs. Gattey, as proof of her strength, her never lying in bed, is shown to be a necessity arising from her disease. There existed in her case perhaps neither delirium nor *absolute* torpor: she was able to answer ordinary questions or salute an acquaintance; but this does not establish competency for every act. But, as observed by Sir John Nichol, "it is a great but not uncommon error that if a person can understand a question put to him, and can give a rational answer, he is of perfectly sound mind, and is capable of making a will for any purpose whatever; whereas the true rule of law—and it is a rule of common sense—is, the competency of the mind must be judged of by the nature of the act to be done, and from a consideration of all the circumstances of the case." (*Marsh* v. *Tyrell*, 2 *Hagg. Ec*.

*R.*, 122.) In regard to the testimony of Mr. Barker, it appears he had no previous knowledge of the testatrix; and all the means he used to test her soundness are before the court, from which it can make its own deductions. This I shall lay aside at present, to examine hereafter, in connection with another important question, the spontaneous character of this instrument. The result of all this testimony, taken together, I regard not as establishing absolute intestability, but only that species of diminution of mental power which, accompanied with any suspicious circumstances as to the origination or execution of the instrument, calls for proof of prior instructions, or complete recognition of every part of the will as being the free act of the decedent. In making such inference, I feel fully justified by the language of various cases. In *Bridges* v. *King* (1 *Hagg. Ec. R.*, 265), Sir JOHN NICHOL says: "At this advanced age; after this long illness; having been confined to her bed two months; being in extreme bodily debility, ending in gradual dissolution; the deceased must so shortly before her death have been laboring under considerable infirmity." In *Montefiori* v. *Montefiori* (2 *Add. R.*, 366), the same judge says: "The deceased was several months in a declining state, worse on the night of the instructions, and five hours before her dissolution this transaction begins. I think it highly probable *a priori*, on the face of this statement, that her capacity was impaired." And the same principle is further elaborated in the case of *Billinghurst* v. *Vickers* ( 1 *Phil. R.*, 193).

This being established, it next becomes necessary to examine her intellection and the origin of the instrument. In regard to the first point, had the case turned upon the question of such proof of the understanding of this instrument as the law requires in case of impaired capacity, I should have hesitated in coming to a conclusion, because something said by her appeared to show a knowledge of part of the contents of the instrument, inasmuch as she suggested giving a legacy to a person omitted; but this, after all, is rather a perception of what was omitted, an instinctive consciousness, than a per-

fect understanding of its contents. With this exception, the case comes fully within the principle laid down in *Croft* v. *Day* (1 *Curt.*, 789), that something must be said or done, showing the proper understanding. The doctrine laid down in that case is corroborated by the cases of *Ingam* v. *Wyatt* (1 *Hagg. Ec. R.*, 469); *Wyatt* v. *Ingram* (3 *Id.*, 466); *King* v. *Farley* (1 *Id.*, 502); *Williams* v. *Goude* (*Id.*, 595); *Durnell* v. *Corfield* (1 *Rob. Ec. R.*, 62); and *Harwood* v. *Baker* (3 *Moore P. C.*, 290).

\*      \*      \*      \*      \*      \*      \*

I think it cannot be denied that Mr. Cox is placed in the attitude of a party benefited, or who may derive a benefit from the will, so as to require investigation as to its spontaneous character and the means taken by the counsel employed to ascertain it. The degree of that interest is immaterial, except perhaps as to the weight of evidence required to prove volition.

In the case of *Tomkins* v. *Tomkins* (1 *Bail. S. C.*, 96), a mere interest as guardian of certain children was considered sufficient to evoke the application of the principle which I shall apply in this case—that the court is bound to be vigilant in ascertaining that the decedent was acting on her own impulses, where capacity is impaired, and the party directing the preparation and execution of the will is benefited. This is not a modern doctrine, or one unsupported by experience. Swinburne says quaintly (1 *Swin.*, 189), " Worthily and with great equity and reason is that to be deemed for no testament when the sick person answereth ' yea,' the interrogation being made by a suspected person." And he puts it both on the ground of suspected deceit as to the legatee, and want of testamentary intention in the decedent. Under the civil law, a preparation by an interested party rendered a legacy to him void. (*Dig. Lit.*, 34, tit. 8.) Under the modification of that law adopted by English ecclesiastical courts, such preparation only throws the burden of proof of voluntary origination with the testator on the person propounding the instrument for probate. It is true that at common law, where a deed

or contract is executed by a party not of unsound mind, he is presumed to understand its contents, and not to be acting under any undue influence; but in courts having exclusive control of the probate of wills of personal property, it is otherwise: mere impaired capacity throws upon the party seeking to benefit by an instrument made under it, the burden of establishing understanding and volition, particularly when prepared by an interested party,—a principle recognized by common-law courts, at least where wills of personal property are in dispute. (*Clark* v. *Fisher*, 1 *Paige*, 176.) An unbroken series of cases in the English ecclesiastical courts, overhauled on appeal by the common-law judges, establish the doctrine incontrovertibly. Sir JOHN NICHOL, in one case,—*Marsh* v. *Tyrrell* (2 *Hagg. Ec. R.*, 87),—says, the party originating and conducting the transaction being present at all material parts of it, " the case proceeds to the evidence of the *factum* under presumptions of fraud and imposition." In another, *Billinghurst* v. *Vickers* (1 *Phil. R.*, 193), " The presumption is strong against an act done by the agency of the party benefited." In a third, *Peak* v. *Ollatt* (2 *Phil. R.*, 323), " Where the person who prepares an instrument and conducts its execution is himself an interested person, his conduct must be watched. Presumption and *onus probandi* are against the instrument." The same doctrine is reiterated in *Ingam* v. *Wyatt* (1 *Hagg. Ec. R.*, 390); *Durnell* v. *Corfield* (1 *Rob. Ec. R.*, 62); and stated in the elementary work of Swinburne (1 *Swin.*, 191), and adopted in the case at common law of *Tomkins* v. *Tomkins* (1 *Bail.*, 96). Whatever may be the theory on which it is founded,— whether the supposition that the benefited party is presumed to have contrived the whole transaction, or the more extensive principle to which I shall presently advert, of being employed in the confidential capacity of procuring the will to be drawn, and therefore to be watched,—I consider it too well settled by decisions, and consistent with the common experience of mankind, to disturb or doubt it.

The additional ground to which I have alluded, why the

case requires conclusive proof of volition and intelligence on the part of the decedent, is the confidential relation subsisting between the party benefited and the testatrix. Mrs. Welsh appears to have been an attendant on Zion Church, of which Mr. Cox was pastor, and favorably disposed towards him, though opposed to the other officers of the church.

Mr. Cox, whose residence was nearly opposite hers, visited her for several years before her death frequently, and latterly almost daily, and it is but fair to presume that his visits, considering her state and his profession, were pastoral. The confidence arising from this must have been very great, so much so that even daily visits were not considered sufficient, and she complained that he did not come more frequently. The comfort therefore of his presence, and the reliance upon his advice, must have been very great; for such is the weakness of human nature, that we come to believe that from the lips whence flows religious instruction, nothing can come less pure. While on the other hand, a religious guide, urged on by the zeal of his profession, and dazzled by the glory of the object, may sometimes be blinded to the means used to obtain it.

Statutes of *mortmain* are left as evidence of the danger arising from the abuse of a confidential relation, and the precautionary means adopted against it, in the case of ecclesiastics. Different municipal laws in all countries have prescribed the cases in which parties standing in a confidential relation to another can take no benefit from them by a gift, particularly executory or prospective gifts; which rule there has been a constant tendency to extend. Thus the law of France, which in terms only mentions " tutors," was by construction extended to schoolmasters, directors of the conscience, and attendant physicians (*Pothier, Don. entre Vifs*, § 1); and that too where the party was alive. The law of England establishes the general principle only as one of presumptive evidence, and leaves the party claiming to be prepared with evidence, in such case, to rebut it. In *Griffin* v. *Robbins* (3 *Madd. R.*, 19), the dependence arose from the in-

firmity of the donor and reliance upon the kindness of the interested party. In *Huguenin* v. *Baseley* (14 *Ves.*, 287), the confidence arose from the party being a spiritual adviser. In *Vaughan* v. *Lloyd* (5 *Ves.*, 48), the party was an agent. In *Dent* v. *Bennet* (7 *Swin. R.*, 546), the party was a physician. But the vice-chancellor gave the instance of a clergyman as an extreme case in which he should apply the principle. In *Gibson* v. *Jeyes* (6 *Ves.*, 278), Lord ELDON stated it to be " the great rule in equity, that he who bargains with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence,—a rule applying to trustees, attorneys, or any one else." If this be so in regard to a contract where the party imposed on has the fear of loss of what he parts with as a spur to his vigilance, how much more should it be so in regard to posthumous bounty, where the testator only directs how that shall go of which death shall certainly deprive him ! The same principle is echoed in *Barrow* v. *Rhinelander* (1 *Johns. Ch.*, 556), where the simple relation of employer and clerk was considered sufficient for its application, and was applied with great effect in *Whelan* v. *Whelan* (3 *Cow.*, 572, 583). Nay, so far has the doctrine been carried, that even after the state of dependence has ceased, if it has ever existed, the same scrutiny is exercised. Thus in *Osmond* v. *Fitzroy* (1 *P. Wms.*, 130), the party claiming had been the confidential domestic of a minor, and obtained, after he was of age, a security. In *Griffin* v. *Devenille* (in Cox's note to 1 *P. Wms.*, 131), a minor had lived with a sister for a long while before coming of age, and had afterwards executed a security to her husband. In *Wright* v. *Proud* (13 *Ves., Jr.*, 137), a lunatic, after restoration to reason, executed a security to a keeper of an asylum for lunatics ; yet the rule was applied though the relation had ceased. Whenever influence may be presumed, it is to prevail (*Evans* v. *Llewellin*, 1 *Cox*, 334 ; also 4 *Mylne & Cr.*, 269); and that, too, regardless of the personal character of the party benefited (*Tomkins* v. *Tomkins*, 1 *Bail.*, 96). This being a general rule of law, it surely is not too harsh to ap-

ply the language of the eminent judge who pronounced the decision in the case of *Harwood* v. *Baker* (3 *Moore P. C.*, 290) to this case: "Protection is most needed where the mind is too enfeebled to take in more objects than one; and most especially when that one object may be so forced upon the attention as to exclude all others that might require consideration." A rule so inflexible cannot yield even to the claims of a supposed scheme for advancing religion, particularly when tinged with sectarianism.

The burden being thus thrown on this executor of proving affirmatively good faith and a proper use of the confidence placed in him, it becomes necessary to examine the facts tending to show it.

[The learned surrogate having arrived at the conclusions—1st, that the faculties of the decedent were so deteriorated as to let in proof of the mode of preparing the will and presenting it to the mind of the testatrix ; and 2d, that its preparation under the direction of a party benefited by it, standing in a confidential relation, raises the presumption of undue influence—proceeds to discuss the testimony and the means employed to discover spontaneity. As his conclusion—that the means which were employed in this case were not calculated to rebut the presumption, and therefore the portions of the will from which the interested party derived his benefit must be rejected—was not concurred in by the general term of the Supreme Court, to which an appeal was taken, though otherwise affirmed, the rehearsal and discussion of the testimony on this point are omitted. The decree of the Supreme Court may be found in the N. Y. Surrogate's office, in Liber of Wills, 107, at pages 1–30.]

It only remains to inquire if the whole will must stand or fall. If the question were *res integra*, both on the score of justice and policy, the power of sustaining part and rejecting part should be upheld ;—of justice, because it would be hard that those who were voluntary and natural objects of bounty should suffer by the acts of another ; of policy, because the fraudulent contriver might throw into the instrument proba-

ble gifts to color the transaction on one hand, and seal the mouths of witnesses on the other; but the law has been settled on this point long since. (*Shelf. on Lun.*, 333 ; 2 *Law Lib.*, 212.) Codicils, which are as much part of wills as if incorporated therein, and draw the will down to their date, as if then republished, are frequently rejected (*Crosbie* v. *MacDoual*, 4 *Ves.*, 610 ; *Sherer* v. *Bishop*, 4 *Bro. C. C.*, 55 ; *Brounker* v. *Brounker*, 7 *Phil.*, 57), leaving the will to stand. In fact, courts of probate exercise complete control over the will, in case of fraudulent insertion in the testator's lifetime, or incapacity during the execution of part (*Billinghurst* v. *Vickers*, 1 *Phil.*, 187 ; *Wood* v. *Wood*, *Id.*, 357 ; *Trimlestown* v. *D'Alton*, 1 *Dow. N. S.*, 85) ; and there is no possible reason for not exercising the same power where part of the will may be supposed to be the result of undue influence. If the jurisdiction is conceded, the reason for exercising it in one case is as strong as in the other. I shall therefore admit to probate that part of the will which is free from imputation, being all except the residuary legacy and the appointment of Mr. Cox as executor. I had some little doubts as to the first legacy to found the scholarship, but the benefit is so little of a personal character, that I think it may be allowed to stand, particularly as, according to the testimony of Mrs. Knapp, the decedent showed a favorable inclination towards such institutions. The management of the funds is vested in a body in which Mr. Cox has no more interest than any other person, and the mere power of selecting the individual to be educated is too remote to come under the rule I have laid down.