New York County.—HON. ROBERT C. HUTCHINGS, Surrogate.— December, 1876.

## Baker's Will.

*In the matter of the probate of the Will of* Susan A. Baker, *deceased.*

When a divorce, granted by a court of another state, is set up in the Surrogate's court here, as rendering legal a subsequent marriage on the validity of which the claim of a party depends, the divorce may be impeached by evidence that it was obtained by fraud and perjury.

Undue influence, vitiating a testamentary provision, may be proved by circumstantial evidence.

From a husband's application for probate of his wife's will, containing a bequest of a life estate to him, it appeared that he had been formerly

married to another woman, against whom he had procured a divorce, by fraud and perjury, and that by fraudulently representing that he was thereby made free to marry again, he had induced the decedent to marry him, secretly, and that while she was his wife she had made the bequest in his favor, now in question. *Held,* that these circumstances were sufficient evidence of undue influence to avoid the bequest.

*It seems,* that the burden of proof as to undue influence in the case of parties standing in a relation of trust and confidence, is upon the beneficiary.*

The Surrogate of the city and county of New York may reject a separable part of a will for undue influence, while admitting the residue of the instrument to probate.

THIS was a proceeding for the probate of a paper propounded as the last will and testament of Susan A. Baker, deceased.

The will was propounded by the executor, by a petition praying that the will might be proved, and letters issue thereon, excepting one bequest or " item" which it prayed might be rejected.

The decedent was an educated lady of high social position, of about thirty years of age, and who, until the time she left the city of New York, in the spring of 1873, with the legatee, John A. Baker, to whom she had been married a few months before, had resided in the family of her mother.

The paper which is offered for probate as the last will and testament of the decedent, contains the following

---

* The most recent English authorities recognize a distinction in this respect, between wills, and transactions *inter vivos*. In the latter class of cases, they apply the rule stated above; in the case of wills, it is held that the mere existence of the special relation does not throw upon the beneficiary the burden of proving fairness, &c. : but the existence of the relation coupled with circumstances of secrecy and suggestion may *do so;* and doubtless the case in the text, where the relation itself was induced by fraud, is consistent with those decisions. Compare on this subject, and see 8 *Harris,* 329; *Parfitt* v. *Lawless, L. R.,* 2 *P. & D.,* 462, 468; *S. C. Moak's Eng.,* 693; *Ashwell* v. *Lomi, Id.,* 483, 705 : *Dean* v. *Nagley,* 41 *Pa. St.* 312; *Monroe* v. *Barclay,* 17 *Ohio St.* 302; *Wilkinson* v. *Joughlin, L. R.* 2 *Eq.,* 319; *Carron* v. *Hunter, L. R.,* 1 *H. of L.* 362; *Fulton* v. *Andrew, L. R.* 7 *H. of L.* 448.

provision, which was the subject of contest in the proceeding before the Surrogate:

"I give and bequeath, and I hereby direct my said trustees, or the survivor or survivors of them, to pay annually to my husband, John A. Baker, me surviving, the sum of fifteen hundred dollars during his said life, or until he shall succeed, by operation of law, to any portion of my estate as heir to the issue of my body, and I hereby make this legacy a charge upon my said estate."

> EVERETT P. WHEELER,(McDANIEL, LUMIS and SOUTHER, *proctors*) *for the legatee.*
>
> STEPHEN P. NASH, CHARLES N. BLACK, (GEORGE M. RAY, *proctor*) *for the executors, contestants.*

THE SURROGATE.—The decedent died in child-birth, in Charleston, S. C., in the year 1874, leaving no issue; so that only the annuity of fifteen hundred dollars for life, could in any event go to the legatee named.

The validity of the clause cited above was contested on the ground of fraud and undue influence exercised over the decedent by the legatee, John A. Baker. It was not contended that she was of unsound mind; or that she did not intend to make the bequest to Baker as her husband; or that a marriage ceremony had not been duly performed by competent authority; but it was claimed by the contestants—the next kin of the decedent—that Baker was not, at the date of the marriage ceremony, competent to marry, by reason of having a wife then living, from whom he had never been legally divorced; that by specious but fraudulent representations he induced the decedent to believe that a decree of divorce which he had obtained in the State of Minnesota, from a former wife, was a valid decree, and under this belief, consent to a marriage without the knowledge of the decedent's family; and either as the result of direct persuasion or indirect influence, and certainly under the

belief that Baker was laboring under no legal disability to prevent him from entering into a marriage with her, at the time the ceremony was performed, and that he, thereafter, was her lawful husband, she made the bequest named—when she would neither have consented to the marriage, nor made him the recipient of her bounty, had she been aware of the real facts connected with his previous marriage and alleged divorce.

To consider intelligently, the question at issue, it is necessary to examine the case with reference to the facts as shown by the evidence.

The legatee, John A. Baker, is a native of North Carolina, and at the death of the decedent was about forty-three years of age. He was educated a lawyer. He was married many years since, to a lady who subsequently died, and who left as the fruit of their marriage, a daughter. In 1867, while a widower, on his way to Europe, he met a Miss Letitia Hargin, a resident of Chicago, whose acquaintance he then formed. Each returned to America during the season, at different times, and in the fall of the same year Baker called upon Miss Hargin, who was residing with her mother in Chicago, renewed his acquaintance, and paid attentions to her with a view to marriage. He subsequently left that city, returned about Christmas, and further pressed his suit. About this time, Miss Hargin informed him of a previous marriage to one Horton, from whom she had been divorced, and furnished him with information to obtain the full facts of the case, if he desired, or, if the fact of her being a divorced woman was felt by him to be an objection to pursuing his attentions further, he might withdraw his suit. In March, 1868, he wrote her a letter replete with assurances of love and affection, and asking her to accept him in marriage. An engagement followed, and, in November of 1868, Baker and Miss Hargin were

formally married in Chicago, and thenceforward, for nearly a year, they lived together, except during his temporary absences; and the evidence seems to show as a fact, that, in the meantime, he was wholly supported by his wife's mother, a lady in prosperous business, and who advanced him considerable pecuniary assistance. But, late in October, of 1869, he abandoned his wife, writing her a letter from Indiana, in which he charged her with gross offences. Twenty-two months after—on the 25th day of August, 1871—he commenced an action for divorce against her in the Fourth Judicial District of Minnesota, in which state he had acquired a domicile. In the complaint, which was neither signed nor verified by Baker, but was signed by his attorneys, it was charged that his wife had practiced fraud and deceit upon him, at the time of their marriage, by concealing from him the fact of her previous marriage to her first husband, Horton (who it was alleged in the complaint had deserted her), and on the discovery of which fraud on her part, he, Baker, had abandoned her; and the complaint further charged her with adultery with certain parties named.

On the same day, Baker made affidavit that the defendant, Letitia Baker, was a non-resident of the state of Minnesota, and that he did not know her then place of residence. Upon this affidavit, the Court granted an order permitting the service of summons by advertisement. The summons was thereupon published in a paper called the *Minnesota Temperance Advocate*. Upon affidavit of Baker's attorney, on the 20th of December, 1871, that no notice of appearance, and no answer had been served on behalf of the defendant, the Court, on motion, ordered that the cause be heard before a Referee, to take and report the evidence and his findings thereon. The cause was tried be-

fore the Referee on the 2d day of January, 1872, when two witnesses were produced, who, according to the record of proceedings in the case, testified in a most brief, vague and general way, to the facts alleged in the complaint; and, in addition, that the defendant was a woman of disreputable character. The finding of the Referee was in accordance with the proofs; and upon it, on the 6th of January, 1872, the Court granted a decree of divorce.

Within a few weeks, at farthest, from the date of the decree—either in January or February, 1872—Baker came to the city of New York, with a letter of introduction from a member of the family of an aunt, Mrs. Brown, resident of Minneapolis (and with whom he had resided when in Minnesota), to the family of Mrs. Lawrence in this city, where he for the first time met her daughter, the decedent, then Miss Susan A. Lawrence, and whose acquaintance he formed. His advent, it appears, was followed in a short time by an offer of marriage to the decedent. It is evident that he pressed his suit strongly, as he followed the family to Lennox, Massachusetts, where they passed the summer, and in the meantime the two had became engaged. But, certain statements derogatory to the character of Baker having come to the knowledge of the decedent's family, and further inquiry bringing to light the fact of his recent divorce, their influence was sufficient to break the engagement, and in September of the same year, Baker returned to Minneapolis, whence, through the medium of Miss Eliza Brown, his cousin, who had come from Minneapolis to New York, for a protracted visit, he opened a correspondence with the decedent, renewed his suit, and sought to reinstate himself in her favor. To convince her of the legality of his divorce from his previous wife, Letitia, and that he was under no legal disability to prevent

him from again marrying, he procured the opinion of
legal counsel in Minnesota, that the proceedings under
which he had obtained a divorce from his wife were
regular, under the practice in that State, and that under
the Statutes the decree could not be opened.   This
opinion and a copy of the judgment roll was, through
the instrumentality of Miss Brown, submitted in Novem-
ber, 1872, by the decedent, to eminent counsel in this
city, who expressed a guarded opinion, on the assumption
of the correctness of the facts stated, in the opinion of
the Minnesota counsel, that the divorce granted was
legal, and that the matters at issue having been passed
upon by a court of competent jurisdiction, the judgment
record would be regarded as conclusive in this State.
The decedent seems, through the means resorted to, to
have been convinced that no legal impediment existed
to Baker's marrying; for three days after the date of
the opinion of the New York counsel, on the 14th of
November, she was secretly married to him at the resi-
dence of the clergyman who performed the ceremony,
in the presence of Miss Brown, the cousin, and a male
friend of Baker, as witnesses; the arrangements for the
marriage having been previously made by Baker,
with the clergyman, who, having been accidentally in-
formed of Baker's recent divorce, and the doubts in
regard to its validity, was also shown the opinion of
counsel in the matter, by which he was satisfied of the
right of the parties to marry.   Baker, soon after, returned
to Minneapolis, and the decedent remained with her
mother in this city, but keeping her family in entire ig-
norance of the fact of her marriage.   During the winter,
Baker kept up constant correspondence with the dece-
dent, through the medium of his cousin, Miss Brown,
with whom the decedent was in frequent communication.

On the 5th day of March, 1873, as already stated, the

decedent secretly executed her will, at the residence of a lady acquaintance on Fifth Avenue, and on the first or second day following—the 6th or 7th of March—she met Baker in front of a dry goods store, on the corner of Sixth Avenue and Fourteenth street, where the two entered a carriage and left the city for Charleston, South Carolina, where the decedent resided with Baker as his wife, until her death, in 1874.

The validity of the paper offered for probate depends upon the question, whether an undue influence was exerted by Baker, the beneficiary of the life annuity provided, over the mind of the decedent, to prevent such an exercise of testamentary power as is necessary to sustain an instrument offered as a will.

No testimony has been presented on behalf of the contestants, to show that Baker exercised any direct personal influence in the preparation and execution of the instrument. On the contrary, so far as appears, the decedent, when alone, gave to the lawyer who drew the paper, her instructions—the gentleman being a reputable member of the bar, whose employment had been suggested by an acquaintance to whom she had confided a knowledge of her marriage, and of her desire to make a will. It is also shown that the execution was delayed for two or three days after its preparation. Baker was not present at the time of the execution, nor is there any proof that he was then in the city, though either the next or the day thereafter, he met her, evidently by appointment, when the two left for Charleston.

It will be seen therefore, that the evidence of undue influence relied upon by the contestants is, of necessity, of an indirect and circumstantial character, but which, it is claimed, is sufficiently strong to justify me in holding that such influence was exerted by the legatee. In other words, the contestants claim that Baker was guilty of

fraud and deceit in imposing himself upon the decedent as a man who had the right to marry, when, in point of fact, he had a wife from whom he was not legally divorced ; that, by resort to specious devices, he convinced her that he was the object of an unjust and unfounded suspicion and prejudice, in the minds of the members of her family; that she, thereupon, consented to a marriage, and thenceforward lived under the delusive belief that no cloud rested upon their marital relation, and that under such delusive belief, if not by direct importunity on his part, she directed the preparation of, and formally executed the instrument containing the bequest in his favor ; whereas, without such false and fraudulent representations on his part, no such delusive belief would have existed and been fostered, and no such marriage would have been contracted, and, without such marriage, no such paper would have been executed.

This case, therefore, presents a novel and rather extreme view of the law applicable to the question of undue influence ; and in determining the matter at issue, it is proper to examine the salient features of the legal proceedings in the action instituted by Baker, in Minnesota, for a divorce from his wife, Letitia, in the light of the facts that have been developed on the hearing before me.

Upon the evidence produced, I am convinced that the divorce proceedings commenced by Baker were conceived in fraud. The following facts are shown :

1. He had secretly abandoned his wife, Letitia, a woman holding a reputable position in society, whose hand he had eagerly sought in marriage, and abandoned her under circumstances most discreditable to himself, and at which time he added insult to injury by accusing her of gross offences.

2. Taking advantage of a brief residence in another

State, if the domicile was not acquired for the express purpose (and in view of all the facts this is fairly inferable), he commenced an action for divorce against his wife, accusing her of both bigamy and adultery—allegations which are shown to have been utterly false, and, so far as the charge of adultery is concerned, Baker himself admits that he had no personal knowledge of the facts alleged.

3. The proceedings were commenced and conducted with special reference to preventing any notice thereof coming to the knowledge of his wife, and yet to comply with the requirements of the statute.   The service of summons was by publication, when Baker knew where his wife had lived for many years.   The publication, too, was in an obscure weekly paper, the name of which imports that it was read by only a special class of readers, and was not patronized by the general public.

4. The proofs given on the hearing before the referee, as recorded, if given at all, were procured by subornation.   One of Baker's witnesses in the divorce suit, who has been produced before me in this proceeding, states that the hearing was had in Baker's law office, by lamp-light; that no oath was administered to him, or to the other witness; that he was questioned by a lawyer in reference to a woman whom he had known in Chicago, and he stated that Letitia, the wife of Baker, who has been present in the hearings before me, and whom he saw here for the first time, was not the person to whom he had reference. If the statement of this witness before me be true, it shows conclusively the foisting of a fraudulent record upon the Court in Minnesota.

He admitted that if he had testified wilfully to the facts as they appear upon the record of the Minnesota Court, he was subject to criminal prosecution.   Neither the fraud nor the perjury, if perjury there be, could have existed without the knowledge of Baker.

I am convinced that Baker resorted to this fraudulent scheme with a full knowledge that the allegations he had caused to be made against his wife were false, and that the case was to be carried through under the forms of law, either by a false and fraudulent record or by fabricated testimony, or by both. Certain it is that his wife Letitia, whom he had secretly abandoned and afterwards defamed, as shown by the proofs before me (she herself appearing as a witness), never knew that any action for divorce had been instituted against her; and it was not until she was found with reference to making her a witness in this proceeding, that she learned that her husband had been divorced from her, and that for over two years her condemnation as an adulteress and a lewd woman had existed on the records of a court of justice. In my judgment, upon a proper proceeding commenced by his wife Letitia, the Court in Minnesota, upon the presentation of the facts, would at once vacate the decree; and certainly the courts of this State, in a proceeding where her rights in the property of her husband within their jurisdiction were involved, would disregard the decree when the facts under which it was obtained were made known to them.

But it is contended on behalf of Baker, that if the judgment of divorce obtained by him against his wife, Letitia, is to be regarded as void, the same rule must apply to the judgment obtained by Letitia, against her first husband, Horton, because the action in that case was commenced by publication—Horton being a non-resident of the State of Illinois—and the defendant having put in no appearance or answer, and the proofs having been taken before a Master, upon whose finding the decree of the Court granting the divorce was entered. Hence, it is argued, if that proceeding and decree were void, Baker was never legally married

to Letitia, and he was, therefore, under no legal disability when he married the decedent.

But the suggestion is not apposite. The proceedings and decree in the case of Baker *vs.* Baker in Minnesota are not claimed to be, nor are they void, because the action was commenced by the service of summons by publication, and because no steps, which might have been, were taken to give the defendant actual notice of the proceeding commenced against her. If void, it is because of fraud or irregularity, or both.

And the proofs before me leave no doubt in my mind that the decree of divorce obtained by Baker was obtained by him in fraud of the law, and in fraud of the rights of his wife Letitia. It is not pretended that the proceedings for divorce in the action commenced by Letitia in Chicago against her first husband, Horton, were obtained by fraud, or supported by perjury. Hence, the only similarity between the case of Baker against his wife Letitia, and the case of Letitia against her former husband, Horton, is in the fact that both were commenced by service of summons by publication, and that both were heard before an officer of the court, upon whose findings the decree was rendered. The proof clearly shows that Baker was cognizant of Letitia's previous divorce, and that he married her in the full belief of its legality. He was a lawyer, and knew where to ascertain the real facts in the case, and he could, if he did not, have intelligently investigated the validity of the proceeding, and the decree which followed it. It is to be presumed that he was convinced that there was no legal disability to prevent Letitia from again marrying; and certainly he acted upon such presumption. The suggestion that she had no legal right to marry, it is apparent, was an after-thought, in the effort to find a plausible ground upon which to rid himself of a relation

in which his cupidity had not been gratified as he had hoped; and still later, in this proceeding, it was an afterthought sought to be availed of to remove doubts of the validity of his marriage with the decedent, in order to establish his right to take a bequest under her will. With a singular inconsistency, he claims the invalidity of his former marriage to a woman divorced from a previous husband, in a proceeding in which there is no pretense of fraud, and yet sets up the validity of his own marriage to the decedent, when his own divorce is shown to have been procured by fraud, if not by perjury. In that is the essential difference between the two proceedings for divorce. And although, in a collateral matter, the legality of his divorce from Letitia, fraudulent as it is, may not be inquired into, yet, when, that record is used as the means to enable him to contract another marriage, under circumstances of fraud and deceit, and to sustain a bequest in his favor resulting from that marriage, I am impelled to disregard it not as establishing any right that comes within my jurisdiction. (*Dobson* v. *Pearce,* 12 *N. Y.,* 156.)

But, in my view, it is not essential, in the determination of this case, to decide whether the decree of divorce obtained by Baker, in Minnesota, is void, or is only voidable. It is apparent that he succeeded in convincing the decedent that it was neither, but that it was valid.

So long as the decedent supposed that Baker's right to marry was beclouded, she withheld her consent. While her mind was secretly being plied with statements to satisfy her that he was of right freed from his wife, and was at liberty to re-marry, and that the opposition of her family was the result of prejudice, they, having no suspicion of the clandestine correspondence, nor of the means to which he was resorting, to accom-

plish his purpose, ignored his existence in her presence that her feelings might not be hurt by recalling memories of an attachment which they supposed was never to be revived. While Baker sedulously pressed upon the decedent evidence to convince her of the validity of his divorce, it is apparent that he studiously concealed from her the base means he had resorted to, to obtain it— the concealment and fraud, and the attempt to blast the reputation of an intelligent and reputable woman in good social standing. His own testimony does not present his conduct in any more favorable light. Many of the essential facts proven by other witnesses in reference to his divorce suit, tending to show that it was conceived and carried through by fraud, are corroborated by facts and circumstances sworn to by him; and where he directly contradicts them, the preponderance of testimony direct and circumstantial, is so strong as to utterly discredit his statements. It is a noteworthy fact that Baker has been conspicuously absent at every hearing in the proceeding before me, though it is shown that he has, during the time, been in the city. With such charges against his honor and integrity, to say nothing of the pecuniary interest he has in the issue of the proceeding, one would suppose that he would have eagerly sought an opportunity to appear personally on the stand, to vindicate himself from the aspersions which had been cast upon him; but he chose instead to be examined under a commission—a means seldom resorted to to obtain evidence when the personal presence of a disinterested witness even can be had without too great inconvenience. It is fair to infer that Baker feared that his examination in open court would establish beyond all doubt the undue influence which it is claimed he exercised over the decedent, and which created and fostered the delusion in her mind that he was rightfully her husband, and

under which delusion she made him a beneficiary under her will.

But the evidence of undue influence in this case is, in my view, adequate to the result attained. Those who have selfish ends to accomplish, through influence exerted upon the mind of another, and which, if known, would result in efforts to countervail them, do not expose to the public the means they use to gain the needful ascendancy. To do so, would defeat their ulterior purpose. Nor is the mind to be operated upon apprised of the object to be gained. The undue influence exercised may be unseen and unappreciated, except by the chief actor and his agents, and be not suspected by others before the result is obtained. Hence, such influence is nearly always shown by circumstantial evidence, and seldom by direct proof. On this point, the language of Judge PORTER, in the case of *Tyler* v. *Gardiner*, (35 *N. Y.*, 559), is very appropriate :

"It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. * * * The purposes to be served are such as court privacy rather than publicity. In some cases, as this Court said, in the case of *Sears* v. *Shafer*, ' undue influence will be inferred from the nature of the transaction alone; in others from the nature of the transaction and the exercise of occasional or habitual influences. The grounds for imputing it, as Sir John Nicholl said in the case of *Marsh* v. *Tyrrell*, must be looked for in the conduct of the parties and in the documents, rather than in the oral evidence. The necessary inferences to be drawn from that conduct will afford a solid and safe basis for the judgment of the Court. Where the oral evidence harmonizes with those inferences, a moral conviction rightfully follows; but the depositions, where they are at variance with the conduct of the parties, and with the *res gestæ*, are less to be relied upon.'"

Viewed in the light of the principle just stated, what is presented in this case ?    The decedent, Susan A. Lawrence, yielded to professions of love made by John A. Baker, an experienced and polished man of the world, and under the influence of the passion which his words and presence inspired, consented to an engagement. But, with proper regard to the proprieties of life, and her own convictions of right, she broke the engagement when doubts were suggested as to his right to enter into a matrimonial alliance.    Yet she believed in his honor and on the integrity of his past acts and conduct, and was only too ready to give credence to every statement, and to magnify the importance of every fact which tended to dispel the doubts which had been raised as to his status as a marriageable man ; and, blinded by love, she was equally ready to belittle the value of any statement or circumstance which militated against him as a man of truth and honor.    Taking advantage of her weakness he played upon her emotions through a clandestine correspondence, while her friends, who appreciated his true character, in deference to her feelings, never alluded to him in her presence.    Baker's kinswoman, Eliza Brown, through whom he had become acquainted with the decedent's family, was in frequent communication with her, and was the convenient medium through which she received his letters.    She was his agent to convey to her the legal opinion of Minnesota counsel that Baker's divorce from his wife Letitia was valid.    She was his agent to visit counsel in New York to get a further opinion to the same effect ; and who subsequently, introduced the decedent to that counsel.    She was a witness of the marriage ceremony performed in secret, under which Baker claimed the decedent as his wife, and further, she was a witness to the paper executed as a will under which Baker claims as a legatee.    All these acts on the

part of Eliza Brown are proven, and with her secret but active agency in behalf of her kinsman Baker, even when she was on visiting terms with the Lawrence family, it is not to be supposed that she did not sound his praises in the willing ears of the woman to marry whom was the immediate object of his scheme. But for the intervention of Miss Brown, it is improbable that the marriage would have been effected, or the paper propounded as a will would have been prepared or executed. And it is a pertinent fact for consideration also, that Miss Brown as well as Baker, was not produced as a witness on the stand, but her examination was taken under a commission, by which she could not be compelled to disclose all the facts within her knowledge connected with her communication and intercourse with Baker and the decedent. The relations of Miss Brown to Baker, as shown by the testimony, were such as to justify the belief that all her acts or influence over the mind of the decedent in obtaining the marriage, and subsequently the execution of the will were as the agent of Baker, and that if they constitute undue influence on her part, they must revert to Baker as the principal.

But while I hold that the contestants have, in view of all the facts and circumstances, established an affirmative case of undue influence, I am further of the opinion that, were the proofs less convincing, considering the relations of the parties, the law would hold that the contestants have made out a case to justify me in declaring the bequest to Baker void, through undue influence. It is a principle of law well settled, that, where there is between the parties a relation of confidence which gives one dominion or influence over the other, gifts or bounties from the weaker to the stronger party, in derogation of the rights of others who are the natural recipients of such gifts or bounties, will not be sustained

by a court, without affirmative evidence on the part of the recipient that they were made without improper suggestion (1 *Story Eq. Jur.*, §§ 307, 323). In other words, the burden of proof is upon the recipient of the gift, whose relation imports dominion over the giver, to show that no undue influence was exerted. In England this principle has been extended beyond those relations under which the questions have usually arisen—the relations of attorney and client, guardian and ward, physician and patient, and trustee and *cestui que trust*—to cover all the various relations of life in which dominion may be exercised by one person over another. (*Dent* v. *Bennett*, 4 *Mylne* and *Craig*, 209; *Lyon* v *Home*, L.R., 6 *Eq.*, 653; *Page* v. *Horne*, 9 *Beavan*, 570; *Coulsen* v. *Allison*, 2 *Giffard*, 279, and 2 *De Gex, Fisher & Jones*, 521.) In the case of *Page* v. *Horne*, Lord Langdale, the Master of the Rolls, says: " It is true that no influence is proven to have been used, but no one can say what may be the extent of the influence of a man over a woman whose consent to marriage he has obtained. * * * The Court will not only consider the influence which the intended husband either by soothing or violence, may have used, but require satisfactory evidence that it has not been used."

In the present case, we have evidence which shows conclusively, to my mind, that the legatee, John A. Baker, had sufficient influence to induce a refined and sensitive women, to whom a violation of the conventional proprieties of life was evidently repugnant, to consent to a marriage in opposition to the wishes of her family, who believed him unworthy of her, and to a marriage in secret—always an act done with regret, and seldom by a woman of the character and social position of the decedent, except when impelled by a passion which would consent to any sacrifice for the object of

her love. And his influence was sufficient, after the marriage had been kept secret for months from her family, to whom she was fondly attached, to consent to clandestinely leave the protection of the household, with the man who had inspired and fostered the passion, to go to a distant State and accept his doubtful protection instead. An influence sufficient to accomplish these results, is equal to procuring the execution of a testamentary instrument from the decedent, which would give the chief actor a life interest in a portion of her estate, and this I hold to have been affirmatively proven in this case; and certainly the one most interested in sustaining the instrument has failed to convince me, as under the law he should do, in view of his relations with the decedent, and of all the facts and circumstances which have been developed in the proofs, that no sinister means were used by him to secure the bequest in his favor.

As the case stands, with its concomitant features of fraud and concealment, on the part of John A. Baker, if not of false testimony on the part of his instruments, in the Minnesota Court, to do away with the natural effect of his previous courtship, marriage and divorce, the knowledge of which by others threatened to defeat the object of another scheme of marriage, there is sufficient, in my judgment, to warrant me in holding that both the marriage and the bequest by the decedent, were obtained by Baker, under the belief that no cloud rested upon his right to become her husband, and without which influence the bequest to him would not have been made.

The validity of the bequest is matter independent of and not affecting the validity of, the other provisions of the instrument, and is presented to me as a question within my jurisdiction, under section 11, chapter 359, of the Laws of 1870. Under that Statute, my power is

clear, though the authority conferred by it, so far as my knowledge extends, has never been the subject of examination by an appellate court. But long anterior to the enactment, Justice ROBERTSON decided in the *Matter of Walsh,* (1 *Redf.* 238), that the Surrogate has power to sustain a portion of a testamentary instrument while rejecting the residue. I should be reluctant, however, to lay down such a rule in the absence of a well-defined authority, and this I find in the Statute referred to. Hence, while I am impelled to hold the provisions making the bequest to Baker void through undue influence, I admit the instrument, in its other provisions, to probate.

Decree accordingly.